# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>AUSTIN WRIGHT,<br><br>    Defendant. | Case No. 5:21-po-00583-SAB-1<br><br>MEMORANDUM DECISION AFTER COURT TRIAL FINDING DEFENDANT GUILTY OF VIOLATION OF 18 U.S.C. § 1382<br><br>ORDER CONVERTING OCTOBER 4, 2022 STATUS CONFERENCE INTO A SENTENCING HEARING |

**I.**

**BACKGROUND**

On August 23, 2021, a citation was filed charging Austin Wright ("Defendant" or "Mr. Wright") with one count of violating 18 U.S.C. § 1382. (ECF No. 1.) On September 7, 2021, Defendant made an initial appearance and entered a plea of not guilty. (ECF No. 7.)

A bench trial was initially set for March 4, 2022, before Magistrate Judge L. Thurston. (ECF No. 3.) On February 1, 2022, this case was reassigned to Magistrate Judge Stanley A. Boone. (ECF No. 6.) A hearing was held on March 4, 2022, however the trial did not proceed, and a status conference was set for April 12, 2022. (ECF No. 8.) On April 12, 2022, the Court held a status conference and set a second status conference for June 7, 2022. (ECF No. 13.) On June 7, 2022, the Court held a status conference, and a bench trial was set for August 2, 2022.

On July 30, 2022, the United States of America (the "Government") filed a trial brief.

1  (Trial Br. ("Br."), ECF No. 16.)  On August 2, 2022, the Court held a bench trial.  (ECF No. 17.)
2  Jason Baskett and Alex Dempsey appeared on behalf of the Government.  Erin Snider appeared
3  on behalf of Defendant, who was also present.  During the trial, the Court denied Defendant's
4  oral motion to dismiss pursuant to Federal Rule of Criminal Procedure 29.  (Id.)  On August 2,
5  2022, an exhibit and witness list was entered on the docket.  (ECF No. 18.)  A status conference
6  is currently set for October 4, 2022.  (ECF No. 19.)

## II.

## EVIDENCE PRESENTED AT TRIAL

The Government called Katy Hutchinson ("Hutchinson") as its first witness.  Hutchinson previously worked as a civilian police officer for the Department of the Air Force at Edwards Air Force Base ("Edwards" or the "Base") from September of 2019 to November of 2021. Hutchinson described her in-field training for this position with senior officers pertaining to traffic stops, investigating criminal activity such as trespass, and other areas.  Hutchinson stated she had issued approximately 75 citations during her time as an officer.  Hutchinson participated in one prior investigation involving trespass as a lead investigator, and approximately three other trespass investigations as an assisting officer.

On May 13, 2021, Hutchinson was in her patrol vehicle at the Base, traveling between the Air Force Research Lab to the South Gate.  The Government's Exhibit 4 was received into evidence, a layout map of the Base (the "Base Layout Map").  Hutchinson identified the Base Layout Map as a fair and accurate depiction of the Base and the area around the Base. Hutchinson described her route of travel on the Base Layout Map, from near the Air Force Research Lab, to the area around Mercury Boulevard ("Mercury")[1] and Lancaster Boulevard ("Lancaster").  Hutchinson observed a green light out in middle of desert west of Mercury. Hutchinson is familiar with the fact there are abandoned aircraft in that location and so drove on a dirt road about 1.3 miles to reach the area, and there she observed a black vehicle parked near

---

[1] The Court will also refer to Mercury as Avenue B, or as Mercury/Avenue B, given the map reflects the street utilizes both these names at different points.

two B52 aircraft,[2] and a male individual standing there.

Hutchinson testified about the location on the dirt road where this occurred on the Base Layout Map. Based on her training, Hutchinson identified this area as being within the exclusive territorial jurisdiction of the United States, within the Eastern District of California, and within the limits of Edwards Air Force Base.

After viewing the individual, Hutchinson started her vehicle police lights and initiated contact. She asked the individual if he was "base affiliated," or if he had permission to be on the Base. Hutchinson testified Edwards Air Force Base is a military installation that requires a common access card, or another defense identification card with biometrics, or a paper guest pass to access. Hutchinson did not recall the precise response, but testified the individual did not produce any of these items or a guest pass stating he had authority to access the Base.

Hutchinson asked for identification and the individual produced a California driver's license. Based on the picture on the identification, Hutchinson identified the individual as Austin Wright, the Defendant in this action. Hutchinson called the information into the Base's law enforcement desk to run things such as criminal history. Hutchinson advised that potential photography was occurring, as Defendant had stated he was taking photographs. Hutchinson stated she reported this because photography is prohibited on the Base unless you obtain permission from the Commander of the Base. Hutchinson stated there is a matrix of certain people that are required to be contacted.

The Government introduced Exhibit 1, a photograph which Hutchinson testified was a sign that contained language indicating the area beyond the sign is a controlled area, and Hutchinson confirmed it as a fair and accurate description of the sign and area as it existed on May 13, 2021. The sign contains the word "WARNING" in large red capitalized letters; the words "Controlled Area," in the next line, in smaller black font; a smaller statement that: "It is unlawful to enter this area without permission of the Installation Commander," with a citation to

---

[2] The Court takes judicial notice that: "The B-52H Stratofortress is a long-range, heavy bomber that can perform a variety of missions. The bomber is capable of flying at high subsonic speeds at altitudes of up to 50,000 feet (15,166.6 meters). It can carry nuclear or precision guided conventional ordnance with worldwide precision navigation capability." *U.S. Air Force, B-52 H Stratofortress*, available at af.mil/About-Us/Fact-Sheets/Display/Article/104465/b-52h-stratofortress/ (last accessed August 11, 2022).

3

1  Sec. 21, Internal Security Act of 1950, 50 U.S.C. § 797; and the statement that "While on this
2  installation all personnel and the property under their control are subject to search." (Ex. 1.)

3    The Government introduced Exhibit 2, a photograph which Hutchinson testified depicted
4  the same controlled area warning in Exhibit 1, along with a mile marker 3 on Mercury.
5  Hutchinson testified the warning signs are placed on both sides of the road approximately 100
6  feet from one another. Hutchinson testified that on the east side of Mercury they are attached to
7  barbed wire fence, on the opposite side, they are attached to poles.[3] Hutchinson testified the
8  signs are placed all along Lancaster to the gate, as well as up Mercury to the Air Force Research
9  Lab, and are also placed on Rich Road all the way to Twenty Mule Team Road, and on
10 Rosamond to a west gate and to the Base property line.

11   In the area where Hutchinson left to investigate the green light, Hutchinson testified there
12 is a warning sign directly across from the dirt road entrance, one approximately fifteen (15) feet
13 east of the dirt road entrance, and a couple signs west, an unspecified distance from the dirt road
14 entrance. When Hutchinson was asked how someone would have to drive to get to the area of
15 the green light, Hutchinson testified they would need to show access identification to get into the
16 main base, denoted by the redline on the Base Layout Map. Hutchinson testified one route is by
17 taking avenue E, then taking Lancaster north, then a right on Mercury, then east on Mercury.
18 Hutchinson testified one could also travel on 140th then turn east onto Mercury.

19   However, Hutchinson also testified that a way to access the B52s without going through
20 an F3 access restriction point was by taking 20 Mule Team Road, then Rich Road to Mercury.
21 Hutchinson testified that at the entrance points, the warning signs are larger than the ones placed
22 regularly on the roads, and there are additional types of signs at the entrances: one that is the sign
23 of a billboard; other warnings pertaining to explosives and firearms; one about the lakebed; one
24 specifically about photography; and one that says you are entering a controlled area and subject
25 to search.

26   After making contact with the Defendant, Hutchinson called in an additional unit.

---

27 [3] The Court notes that Mercury/Avenue B runs north/south at one point and thus the fence would be on the "east"
   side of the road as Hutchinson testified, though at the point Mercury/Avenue B hits the dirt road entrance at issue in
28 this case, Mercury/Avenue B is running east/west. (See Base Layout Map.)

1 Hutchinson's investigation revealed that Defendant did not have authorization to be on base, and 2 did not have an outstanding warrant or criminal history.  Hutchinson issued a citation for 3 trespassing on government property.  The other Air Force officials then assisted with collecting 4 information for use in potential contacts in the future.  Hutchinson escorted Defendant off base 5 property.  Defendant asked Hutchinson if there were other locations he could look at so it 6 wouldn't be a wasted night.  Defendant also showed Hutchinson his light, and Defendant told 7 Hutchinson to check out Defendant's Instagram profile because there would be something on 8 there she would be interested in.  Defendant told Hutchinson the name of his Instagram profile 9 was "Urbex Offlimits."  Hutchinson confirmed she viewed the Instagram page.

10       The Defense introduced Exhibit A, which Hutchinson confirmed to be an aerial view of 11 the Base.  Exhibit B, an aerial view of the Base, with a view of the dirt road heading north, was 12 also received.  Exhibit C was also received and confirmed to be an accurate overhead view of the 13 Base.

14       Exhibit D was admitted, and Hutchinson identified the photograph as depicting the 15 entrance to the dirt road off Mercury/Avenue B.  The picture shows a concrete barrier to the left 16 of the entrance. (Ex. D.)  Exhibit E was admitted, another picture of the dirt road entrance.  The 17 concrete barrier is visible to the left of the entrance, and tire tracks are visible in the photograph. 18 Hutchison testified she was not aware how often the road was used, that she never cited anybody 19 on this particular dirt road, and had not heard of others being cited on it.  Hutchinson confirmed 20 the B52 aircraft would be visible from the roadway during the day.

21       Hutchinson testified she stopped working at the  Base in November of 2021.  Hutchinson 22 confirmed there were changes during her time in her previous position at the Base.  The Base 23 would change fence lines and put up better fencing and complete other work, but Hutchinson 24 confirmed Exhibits D and E fairly depicted the conditions that existed on May 13, 2021, to the 25 best of her recollection.

26       Hutchinson again testified there were signs approximately 100 feet from each other on 27 either side of the dirt road, alongside the asphalt road in the photograph, Mercury/Avenue B.  28 Hutchinson also confirmed they are reflective signs saying controlled area, like the ones in

1 Exhibits 1 and 2. Hutchinson confirmed these signs are parallel to Mercury/Avenue B. Hutchinson testified the entrance with the greater number of different signs is at 20 Mule Team road and Rich road, which is approximately eighteen (18) miles from the dirt road. Hutchinson had never heard of people using the dirt road before. Hutchinson confirmed that along the route from the 20 Mule Team road entrance to the location of incident at the B52s on the dirt road, there were signs like those identified in Exhibits 1 and 2 at approximately 100 feet intervals.

The Government's second witness was Senior Airmen Kennedy Chmelar ("Chmelar"), who works at Edwards Air Force Base as the Defense Biometric Identification System ("DBIDS") Manager for the Base. Chmelar trains air force members on how to use the DBIDS system, and fixes and replaces the parts of the system. Chmelar trained with the previous position holder, had on the job training, and every 1 to 2 months completes a DBIDS refresher course. Chmelar has held the position for approximately one and a half years.

Chmelar testified the DBIDS system tracks people who access the installation; and that normally to enter the Base a person would have to have an affiliation, such as being a contractor, military, spouse, or know someone on the Base. Chmelar testified that if someone gains access to the Base, they go into the system DBIDS system. Chmelar stated the first point of contact with the system is generally through the visitor control center or entry gate, and the person is ran through the DBIDS system, a profile is created, and a secure pass is made. Chmelar testified that if someone doesn't have a DBIDS profile, one will be established during the person's first visit, and if a person doesn't have a profile, such person most likely have never accessed the Base as you cannot go on the Base without a DBIDS system profile. However, Chmelar stated in the case of when the DBIDS system is down, there is a form that is completed at a gate, and you are required to have the form to access the Base. Chmelar confirmed knowledge of these requirements to access the Base is based on her training on who is supposed to be on Base, how to gain access, and her knowledge that Edwards Air Force Base is generally closed to the public.

Chmelar ran a database check on Defendant Austin Wright through the DBIDS portal using Mr. Wright's social security number that was on the citation issued. Chmelar confirmed DBIDS records are maintained in the regular course of her duties, and that she can run searches

of such records to identify an individual. Exhibit 3 was confirmed by Chmelar to be a depiction of the query of the DBIDS record database search showing no such available record for Defendant Austin Wright. Chmelar testified these search results mean that for that social security number, a profile would have populated if one existed, and that means a person with the social security number on the citation never had a DBIDS profile or military affiliated identification from any military installation, nor as a permitted visitor at any such installation.

Chmelar confirmed that you do not have access authority without a DBIDS profile, but also confirmed that there are public roads that go through the base, such that someone traveling on Mercury wouldn't necessarily have had to go through the DBIDS process.

The Defense called Vincent Lee ("Lee") as a witness, who is the investigator with the Federal Defenders assigned to this case. Lee visited Edwards Air Force Base on May 25, 2022, and again the day before the trial, August 1, 2022.

Lee confirmed Exhibit A showed an aerial view of Mercury/Avenue B, the area he traveled to on May 25, and August 1, 2022. Lee confirmed Exhibit D as a photograph Lee took of Mercury. Lee testified there are various parts of the area in Exhibit D that are blocked off with barbed wire fencing; then there is an entrance (the dirt road) to get into the area with concrete barriers next to it, and thus the dirt road is accessible from the main road off Mercury/Avenue B.

Lee confirmed Exhibit G as a photo of fencing taken by Lee, and identified metal posts and some barbed wire as part of the fence system. Lee testified the fencing does not extend across the dirt road, but recalls it does pick up again after the dirt road.[4]

Lee confirmed Exhibit F as a photograph Lee took of the entrance onto the dirt road from Mercury/Avenue B. Lee confirmed the asphalt road in the top left the photo is Mercury/Avenue B, and if facing westbound in photo, if you make a right turn (northbound), you access the dirt road. Lee testified it appeared the dirt roadway looked used because there were tire tracks. Lee did not observe any other barriers to the dirt road. Lee testified there is a warning sign parallel to

---

[4] The fencing appears to be damaged where it ends, with pieces of the post and wiring strewn haphazardly. (Ex. G.)

1 road, about 100 feet down the asphalt road, but did not recall if there was another warning sign 2 on the other side of road. Lee stated there was no warning sign directly at the entrance to the dirt 3 road.

4 Lee testified there were other roads he observed that did have barriers. Lee confirmed 5 Defense Exhibit I showed barriers and a sign stating road closed, posted in the vicinity on 6 Mercury/Avenue B, approximately less than a mile away from the dirt road entrance. Lee 7 confirmed Exhibit J as his photograph depicting the same road closed sign and concrete barrier 8 in Exhibit I, but closer.

9 Lee testified the warning sign depicted in the Government's Exhibit 2 is approximately 10 24 inches by 30 inches, and Lee estimated it to be 75 to 100 feet from roadway, parallel to the 11 roadway, and thus you would have to turn your head to see the signs when driving down the 12 road. Lee drove on Mercury/Avenue B on May 25, 2022, at approximately 8:00 to 8:30 p.m. in 13 the evening. The Defense published Exhibit K, a video taken by Lee traveling south and 14 westbound on Mercury/Avenue B, on May 25, 2022, around 8:30 p.m. At the 11 second mark of 15 the video, Lee testified the asphalt road visible is Mercury/Avenue B, that on the right is a 16 warning sign, and then the right turn entrance opening to turn onto the dirt road. Lee believes the 17 speed limit is 55 miles per hour at that section of the road. Lee testified that while making that 18 drive at night, he was unable to make out the text on the white warning signs.

19 Lee testified he had not visited before May 25, 2022, and has general knowledge about 20 the access procedures from preparing for this case. On cross-examination, Lee confirmed that in 21 the video Exhibit K, the sign visible was one of the signs from Government Exhibit 1, and that 22 the distances was 75 to 100 feet, but confirmed he did not measure the distance. As for Exhibit 23 H, Lee testified he was not sure how old the tire tracks were, nor whether they were military or 24 civilian tires.

**III.**

**DISCUSSION AND DECISION**

27 Defendant has been charged with a violation of 18 U.S.C. § 1382, which provides in 28 relevant part: "Whoever, within the jurisdiction of the United States, goes upon any military,

8

naval, or Coast Guard reservation, post, fort, arsenal, yard, station, or installation, for any purpose prohibited by law or lawful regulation . . . [s]hall be fined under this title or imprisoned not more than six months, or both." 18 U.S.C. § 1382. The Government submits that to prove a violation of 18 U.S.C. § 1382 here, it is the Government's burden to establish beyond a reasonable doubt that Defendant Wright: (1) was within the jurisdiction of the United States; (2) went upon a military reservation, post, arsenal, yard, station or installation; and (3) went upon such military reservation, post, arsenal, yard, station or installation, for a purpose prohibited by law or lawful regulation. (Br. 3.)

Unlike common law trespass, Section 1382 requires the initial entry into the prohibited area be made for a prohibited purpose. United States v. Cottier, 759 F.2d 760, 762 (9th Cir. 1985) (citing United States v. Hall, 742 F.2d 1153, 1154 (9th Cir.1984)). However, the prohibited purpose "may be the unauthorized entry itself." Id. "Thus, 'going upon a military base with knowledge that such entry is unauthorized violates 18 U.S.C. § 1382.' " Cottier, 759 F.2d at 762 (quoting Hall, 742 F.2d at 1155). The "purpose prohibited by law" requirement "is satisfied if the defendant *knows* that his entry is unauthorized." Id. (emphasis in original). Where a "commander has restricted entry under lawful authority . . . this is sufficient to meet the 'prohibited by law' requirement if [defendant] *knew* his entry was unauthorized." Id. (emphasis in original) (quoting 18 U.S.C. § 1382). In other words, the "government need not prove that a defendant acted with a specific intent[,] [r]ather, '[w]here entry alone is the basis of the violation,' the government must prove only that the defendant knew that 'the entry [was] unauthorized.' " United States v. Omondi, 818 F. App'x 623, 625 (9th Cir. 2020) (first citing United States v. Mowat, 582 F.2d 1194, 1203 (9th Cir. 1978); then quoting Cottier, 759 F.2d at 762), cert. denied, 141 S. Ct. 171 (2021).

The Court finds the Government has established beyond a reasonable doubt that: (1) Defendant Austin Wright was the individual that went upon Edwards Air Force Base on May 13, 2021, and encountered Air Force police personnel; and (2) Edwards Air Force Base is a military installation within the territorial jurisdiction of the United States. The territorial jurisdiction and status of Edwards Air Force Base as a military installation is established by Hutchinson's

9

testimony concerning the Base Layout Map, her training, her experience as a law enforcement officer patrolling the Base, as well as by the testimony of Chmelar that the Base is generally closed to the public and subject to the DBIDS system.  This finding as to Defendant is also based on the testimonial evidence of Hutchinson, including the investigation and use of the driver's license to identify Mr. Wright on that night., as well as the testimony of Chmelar utilizing the DBIDS database to run a search on Defendant's information contained in the citation.

The Court additionally finds the Government has established beyond a reasonable doubt that Defendant Austin Wright went upon the military installation of Edwards Air Force Base for a purpose prohibited by law or lawful regulation.  The Government has established the prohibited purpose of entry without authorization beyond a reasonable doubt.

The Court's conclusions are based primarily on the testimonial evidence of witnesses Hutchinson and Chmelar concerning the closed status of the Base and the DBIDS system, and the photographic evidence submitted concerning the presence of posted signage announcing the restricted and controlled military installation area posted approximately every 100 feet along Mercury/Avenue B.  Based on this evidence, the Court finds the Government has established beyond a reasonable doubt that Edwards Air Force Base is a restricted military installation with controlled access. See Exs. 1-2, D-F, K; 18 U.S.C. § 1382; 50 U.S.C. § 797(a)(1) ("Whoever willfully violates any defense property security regulation shall be fined under Title 18 or imprisoned not more than one year, or both."); 50 U.S.C. § 797(a)(4)(D) ("The term 'regulation' includes an order."); 50 U.S.C. § 797(b) ("Any regulation or order covered by subsection (a) shall be posted in conspicuous and appropriate places."); 32 C.F.R. § 809a.2 ("Each commander is authorized to grant or deny access to their installations, and to exclude or remove persons whose presence is unauthorized."); 32 C.F.R. § 809a.3 ("[A]ny directive issued by the commander of a military installation or facility, which includes the parameters for authorized entry to or exit from a military installation, is legally enforceable against all persons whether or not those persons are subject to the Uniformed Code of Military Justice (UCMJ)."); 32 C.F.R. § 809a.3 ("Civilian violators may be prosecuted under 18 U.S.C. 1382.").

The Court finds the Government has established beyond a reasonable doubt that

Defendant did not have authorization to be in the location that Defendant was in when he was approached by Hutchinson. Specifically, the Court finds sufficient evidence to find Defendant did not have authorization to enter the Base and be in the location on the dirt road next to the B52s, based on the testimony of Hutchinson concerning her investigation overall, the DBIDS database check completed by Chmelar and her other testimony concerning the closed status of the Base, and the Court's review of the photographs of the warning signs and testimony concerning such warning signs that existed on Mercury/Avenue B. See United States v. Cross, 511 F. App'x 667, 668 (9th Cir. 2013) ("[T]he evidence is sufficient to conclude that Cross lacked authorization to enter the base . . . Cross was unable to produce any identification when asked by officers . . . testimony about military dependent identification cards undercuts Cross's argument that she entered the base using a valid identification card.").

Again, prohibited entry of the military installation, standing alone, can be a violation of Section 1382, provided there is knowledge that the entry is unauthorized. Cottier, 759 F.2d at 762 ("Where entry alone is the basis of the violation, knowledge that the entry is unauthorized is an essential element of a section 1382 offense . . . [t]he importance of this knowledge arises in that only innocent trespassers are excluded from purview of 18 U.S.C. § 1382."). The Court must thus determine whether there was sufficient evidence demonstrating Defendant had knowledge the entry was unauthorized. Cottier, 759 F.2d at 762 (quoting Hall, 742 F.2d at 1155).

Based on the testimony of Hutchinson, Chmelar, and Lee, concerning the Base and location of warning signs, as well as the photographs and video of the area of Mercury/Avenue B, the area around the dirt road entrance, and of the warning signs, the Court concludes the Government has established beyond a reasonable doubt that Defendant knew that entry into the area where he was when Hutchinson made contact., was unauthorized. Cross, 511 F. App'x at 668 ("Second, the evidence was sufficient that a rational trier of fact could conclude beyond a reasonable doubt that Cross knew she was unauthorized to enter the base [as] [t]he record demonstrates that the base was surrounded by a chain-link fence and all entry gates had posted signs warning that permission to enter was required [and] Cross's statements to officers indicated

that she was aware she needed identification to enter the base."); Omondi, 818 F. App'x at 625 ("Omondi left that designated area by himself and crossed over the painted green line . . . passed a large sign indicating he was entering a restricted portion of the base, and after walking nearly 100 yards, he approached a line of officers standing shoulder-to-shoulder blocking any further entry into the base [and] [l]astly, the government introduced evidence that Omondi was arrested on three previous occasions for illegally entering Vandenberg.").

The Court finds the Government has established knowledge by the Defendant of the prohibited nature of accessing this area, beyond a reasonable doubt. The Defense urges the Court find reasonable doubt because the entrance point of this particular dirt road had a portion of broken fence and a concrete barrier on the side of the opening, rather than a more clearly blockaded entrance like that existed in Defense Exhibit I; because warning signs were not placed precisely in front of this particular access point; and because the warning signs that were placed approximately 100 feet along both sides of Mercury/Avenue B were parallel to the road and difficult to read at night, and thus did not impute knowledge on the behalf of Defendant.[5] The Court does not find these specific facts to create reasonable doubt as to the imputed knowledge on the Defendant here, based on the totality of the circumstances established by the testimonial and photographic evidence.[6] Based on the totality of evidence, the Court finds beyond a

---

[5] While the Court could not read the text of the signs in the video exhibit (acknowledging attempting to view details in video has its own limitations aside from distance and time of day and the size of the font), the reflective signs along the fence *are* visible, and it appears to the Court the reflective nature of the signs would be visible in the peripheral vision of a driver traveling at night, or at least indicate that there is a fence line with reflective signs on it establishing some sort of property boundary.

[6] The Court recognizes the entrance to the dirt road off Mercury/Avenue B did not have a warning sign posted at the precise spot where the Defendant's vehicle rolled its wheels across the Base's perimeter. The Court also recognizes that the fencing barrier did not extend across and physically block access to that area. The Court further acknowledges testimony that a civilian traveling on Mercury/Avenue B may not have had to travel through an F3 access entrance gate, and thus it is possible to be traveling on Mercury/Avenue B and not have passed through a gate requiring entry into the DBIDS system. The Court considered whether this amounts to somewhat less circumstantial evidence of actual knowledge than may have existed in Cottier or Omondi. See Cottier, 759 F.2d at 761-62 ("The chain link fence surrounding the facility stands about eight feet high and is topped by three strands of barbed wire . . . the only access is through one padlocked gate . . . and the character of Cottier's defenses strongly suggest Cottier knew he was inside a missile launch facility operated by the government."); Omondi, 818 F. App'x at 625 ("Omondi . . . approached a line of officers standing shoulder-to-shoulder blocking any further entry into the base [and] the government introduced evidence that Omondi was arrested on three previous occasions for illegally entering Vandenberg."). For the reasons explained above throughout this opinion, the Court finds the totality of the evidence establishes guilt beyond a reasonable doubt.

reasonable doubt that Defendant had knowledge entering *that* dirt road entrance was unauthorized. The Court declines the Defense's invitation to find reasonable doubt in knowledge of unauthorized access where Defendant essentially traveled along a fence of a military installation, dotted with warning signs every 100 feet along such fence, and then entered a gap in such restricted area that is nonetheless mainly fenced off aside from such limited break in the fence, with a concrete barrier visible on the side of the entrance area.[7]

Instead, this limited gap in the face of continuous barricades, fencing, and warning signs, clearly does not demonstrate a complete abdication of military power over this portion of the Base. See Williams, No. CRIM. 92-904M, 1992 WL 200878, at *4 (D. Colo. July 10, 1992) ("The very nature of a military base grants a commander the ability to limit access and conduct . . . The exception would be when there has been a *complete abdication* of military power over a portion of the base property.") (emphasis added). The Court concludes that Defendant had various forms of actual notice of the parameters of the Base, and Defendant had knowledge he was entering a prohibited area without authority. See United States v. Vasarajs, 908 F.2d 443, 448-49 n.8 (9th Cir. 1990) ("We apparently never before have been presented with a defendant convicted of violating § 1382 who claimed she lacked knowledge of a reservation's boundary lines . . . [n]onetheless, we need not determine the exact parameters demanded by due process in this case because the facts establish that actual notice of the entrance of Fort Richardson was provided to Vasarajs [and] [w]e hold that the signs posted along the access road leading up to the guard shack adequately announced themselves to Vasarajs as the dividing line between the highway and the Fort . . . [t]hese signs provided reasonable notice that Vasarajs had left behind civilian territory prior to reaching the guard shack."). Here, while there may have been a limited opening or a gap in the fence where there was no direct warning sign blocking the entrance to

---

[7] The presence of the concrete barrier itself indicates attempts at blocking entry at that point, whether or not the entirety of the area of the desert was blocked by cement and fencing. The ability to enter a military base at one point without physically bumping into a fence or a warning sign, does not equate to an abdication of military power over this portion of the Base, and knowledge of the trespass can be imputed based on the manner of signage and fencing along the perimeters of the Base, which here the evidence establishes Defendant encountered. The Court does not find 18 U.S.C. § 1382 and Ninth Circuit law to be an invitation for individuals (whether curious photographers or those with more nefarious intent), to essentially test the borders of a military installation for differently blockaded or marked areas.

such dirt roadway, the warning signs abound along Mercury/Avenue B, on both sides of the Mercury/Avenue B, and are confirmed to exist on both sides of the dirt road entrance along Mercury/Avenue B as well. The totality of the evidence concerning Base entrances, fencing, signs, and barricades, establishes knowledge on the behalf of Defendant that the entry was unauthorized.[8]

Accordingly, based on the evidence presented by the parties during the trial, the Court finds that the Government has proven beyond a reasonable doubt that Defendant Austin Wright is guilty of a violation of 18 U.S.C. § 1382. The evidence and arguments presented by Defendant did not refute the evidence of guilt presented by the Government, or establish reasonable doubt.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

---

[8] The circumstances in Reid are similar to those that occurred here, however, there the Ninth Circuit's analysis only went as far as whether probable cause existed for the arrest:

> At the time of defendant's arrest, the arresting officer was aware of the following facts. The officer came upon defendant in a wooded, training area of Fort Lewis. Defendant was in his car traveling in reverse on a dirt road that connected two public highways. Defendant was a short distance from a sign showing he was in an unauthorized area. If he had entered this dirt road from the side with the sign, then he certainly would have been on notice; but if he had entered from the other side, he would not have come upon the sign until he reached the opposite side. The car did not have any decal, pass, or other marking identifying it as authorized to be on the grounds of Fort Lewis. When asked if he had any military or authorized purpose to be at Fort Lewis, defendant responded: "I don't have any military affiliation or Fort Lewis training area access pass." On these facts, a reasonable and prudent person could conclude there was a fair probability that defendant was in a prohibited military area with sufficient notice or knowledge that it was a prohibited area. Therefore, probable cause existed for the arrest and there is no basis for overturning defendant's conviction.

United States v. Reid, 389 F. App'x 711, 712–13 (9th Cir. 2010) ("On appeal, the only issue is whether there was probable cause to arrest defendant for violating § 1382."). Aside from the more narrow issue on appeal, unlike Reid, the testimony and evidence introduced here demonstrates that Defendant did indeed pass warning signs on Mercury/Avenue B on the approach to the dirt road entrance, and the barbed wire fence blocked entrance to this area beyond the limited dirt road entrance area, whereas in Reid, there was a possibility the defendant never passed the sign given the point he was at on the dirt road. See id.

## IV.

## CONCLUSION AND ORDER

For the above explained reasons, the Court finds the testimony and other evidence establishes beyond a reasonable doubt, that on May 13, 2021, Defendant Austin Wright, while within the jurisdiction of the United States, went upon a military installation for a purpose prohibited by law or lawful regulation, in violation of 18 U.S.C. § 1382.

Accordingly, IT IS HEREBY ORDERED that:

1. Defendant Austin Wright is found guilty of a violation of 18 U.S.C. § 1382;
2. The status conference set for October 4, 2022, at 10:00 a.m., is converted to a sentencing hearing;
3. The parties may continue the sentencing hearing to a future date if they so desire; and
4. Defendant is authorized to appear via videoconference at the October 4, 2022 sentencing hearing.

IT IS SO ORDERED.

Dated: **September 28, 2022**

UNITED STATES MAGISTRATE JUDGE